DAVID L. COLE *et al.*, Plaintiffs-Appellees, v. LOIS J. BYRD *et al.*, Defendants (Community Grain Company *et al.*, Intervenors-Appellants).

Fourth District    No. 4—93—0988

Argued June 22, 1994.—Opinion filed August 26, 1994.—Rehearing denied September 26, 1994.

GREEN, J., specially concurring.

Dawn L. Wall (argued), of Costigan & Wollrab, P.C., of Bloomington, for appellants.

David V. Dorris (argued), of Jerome Mirza & Associates, P.C., of Bloomington, for appellees.

JUSTICE LUND delivered the opinion of the court:

The sole issue before our court is whether the circuit court of DeWitt County erred in not allowing intervenor, Community Grain Company (Community Grain), and its worker compensation insurer, Farmland Mutual Insurance Company (Farmland), reimbursement from plaintiff David Cole for a specific $12,577.96 expense incurred by Farmland. Other compensation expenditures were awarded from plaintiffs' $1,752,037 common-law action jury award.

The $12,577.96 expense resulted from Farmland's hiring the services of Professional Rehabilitation Management (PRM). The trial court found the PRM services were for "management" of the workers' compensation case, as opposed to "medical treatment" and, therefore, not compensable under section 8(a) of the Illinois Workers' Compensation Act (Act) (820 ILCS 305/8(a) (West 1992)).

Plaintiff was seriously injured in the course of his employment, when the truck he was driving was struck by a school bus. In an offer of proof during trial of the common-law action, PRM employee Nancy Peck, a registered nurse, testified she was hired as a third-party objective consultant to assure that appropriate medical care was given. When asked whose interests she was obligated to protect, the insurance company or the patient, she replied: "The patient, to see that that person gets the best medical care, ends up being as good a person medically as he or she can be." However, when asked whether she considered her work medical treatment or management of the workers' compensation case, she replied "management."

Peck was then asked to give a general overview of the services she provided plaintiff. She replied:

"I started with David Cole in October of '88. Initially I interviewed him, which gives me a whole picture of his case and this follows with the objectivity. How did he feel about his medical care, was he happy with his physicians, how was he doing, visually could see how was he doing.

From there initially I went through the medical records also, and from there I recommended to the insurance company, yes, I think he is receiving appropriate medical care, he is seeing an orthopedic specialist. After the initial interview I kept in contact with him again to see how he was doing. I would go to the office visits with him. Periodically I would go to physical therapy to see how he was doing there, again, all this time to see whether he is making any improvement, what is going on, where could I recommend maybe some more efficient management.

***

I can think of one particular instance where in the wintertime he was having trouble getting back and forth to Champaign for physical therapy, and I did some research in the immediate area to see if some amount of physical therapy could be obtained in his area. It wasn't possible. But that was one case because if he could have gotten it there it would have saved him trips back and forth to Champaign.

When he had his surgeries I would make contact with him, sometimes in the hospital, to follow up with his home health. This was a big thing and probably the first six months, maybe nine

months, and this certainly wasn't cost effective. But this was a better management tool, to visit with him to see if he needed home help nursing, to see if there was anything in the home that he needed in the way of equipment. Several times I assessed the home as far as the bathroom, were there any modifications that could have been done to make the bathroom more easily accessible for him. He was there by himself during the daytime quite a bit of the time because his wife worked, and so I made some assessments of the kitchen, [were] there areas there that could be modified for him to make those facilities more accessible.

I offered all along the way quite a bit of moral support to him. Also maybe some support in the way of answering questions. He always had a lot of questions about what was going to happen to him as far as the next surgery goes, what would happen to him in another month or two."

Peck admitted that she was responsible for reporting plaintiff's progress to Farmland. A small portion of the charges for her services was for time spent consulting with the attorneys involved in the litigation and preparing reports for Farmland. Analyzing cost effectiveness only came into play when ordering equipment or long-term supplies. She never saw any of the bills for her services, and cost effectiveness of medical care was not her concern. She admitted that she followed orders from Farmland; if they told her to work more with the patient, she would work more. If they told her to stop, she would stop.

At the conclusion of Peck's testimony, the trial court held that her services did not constitute treatment, but merely management of the workers' compensation case. Accordingly, Peck's testimony was not given to the jury, and PRM's fee was not admitted into evidence as proof of plaintiff's medical expenses.

Following trial, a hearing was held to determine the amount of the intervenors' lien. In support of their position, the intervenors presented excerpts of Peck's trial testimony made during the offer of proof. In addition, Nydra Owen, the master claims adjustor for Farmland, testified regarding Peck's duties and the handling of plaintiff's workers' compensation case. Owen was responsible for retaining PRM and assigning them to plaintiff's case. She testified that PRM was placed on his case just prior to his coming home from the hospital. Her purpose was to make certain he received what he needed when he was at home. When asked why she retained Peck's services in this case, she replied:

"Okay. In this particular case, after I had met with them, they had a close family and I was real concerned, because traditionally or statistically when you have a catastrophic injury, as we had in

this case, many times, you have a lot of family problems and I wanted to unload, as much as I could, on that family situation. So that there wouldn't be any family problems. So, I wanted to make sure he got the best that he could get in home care and that type of thing.

BY MS. WALL:

Q[.] And, did Nancy Peck then provide that service to Farmland through PRM?

A[.] Yes, she went out there to make sure. She went to the hospital, I believe, to make sure that he would have whatever he needed when he went home."

Owen also discussed Peck's role with regard to cost containment of plaintiff's medical case. Owen stated that Peck was responsible for contacting Farmland when expenses were incurred through any treatment that Peck had recommended. However, she would only contact Farmland when these costs exceeded her own recommendation. Owen denied that she ordered Peck to pursue the most cost-effective treatment, claiming there were times when Peck's recommendations actually increased the cost of plaintiff's treatment. She stated that Peck was not hired to do any auditing of the medical services provided. She added that auditing services were offered through a completely separate department at PRM. She also denied that Peck performed any tasks in the nature of claims handling that aided her in handling plaintiff's file. Owen summarized her own role in handling plaintiff's case:

"[W]hen you have several doctors, it's difficult to have one person to be able to work, because many times, those doctors are so busy, that you can get additional explanation on what they said. I think all of us have been to a doctor where they have been so rushed.

Q[. Plaintiff's counsel:] Then, your primary interest in this, your loyalty and interest was to your employer, wasn't it?

A[.] In this particular case, let me give you a little bit of preface. I was an administrator for several years. This was the first catastrophic injury that I actually went out in the field on and, even though, I handled for several years injuries in the office, at this level, when you see the school bus and you see the vehicle and you see the people and you will see them, it touches you more than if you are in the office. My concern when I went out to see David and saw David [with] his family and I can truly say that in this particular case, I was most concerned yes. I worked for Farmland a long time. In this particular case, I was not out to save Farmland money."

After hearing arguments, the trial court concluded that, although Owen cared about plaintiff's condition, she did not know specifically what services Peck provided. The best person to know what Peck was doing, the trial court stated, was Farmland (which received her reports). After reviewing Peck's testimony, the trial court decided she was an agent of Farmland and denied the intervenors' request to include PRM's fee in their lien.

●1 In cases like this, if damages are recovered in a common-law action, employers are entitled to reimbursement for compensation paid under the Act (820 ILCS 305/5(b) (West 1992)). Section 8(a) of the Act requires the employer to pay for all necessary first aid, medical and surgical services, and all necessary medical, surgical, and hospital services, as long as it is reasonably required to cure or relieve the effects of the accidental injury. In addition, the employer must also pay for treatment, instruction, and training necessary for the physical, mental, and vocational rehabilitation of the employee, including all maintenance costs and incidental expenses. If, as a result of the injury, the employee is unable to be self-sufficient, the employer shall pay for such maintenance or institutional care as shall be required. 820 ILCS 305/8(a) (West 1992).

●2 This case involved serious injuries and necessarily required involvement of various medical and surgical specialists. It does not take much involvement with the busy schedules of medical specialists to realize the limited time spent with different patients. What we have here, with the use of Nancy Peck, appears comparable to the services of the country doctor who took time to counsel with, and psychologically assist, his or her patients.

Often both spouses are employed. In cases similar to this, home care has its limitations due to the absence of the other head of household. This, with the absence of house visits by physicians, creates a greater demand for the specialty exemplified by Nancy Peck. We conclude the service falls within the requirement for instruction and training necessary for the physical, mental, and vocational rehabilitation.

In reaching the decision, we recognize the entry into uncharted waters. We also recognize that compensation carriers are aware, when they provide these services, that reimbursement may well not be forthcoming. This, in itself, will police the abuse of providing the services. The evidence in this case establishes the services were basically for the benefit of David and, indirectly, Sherry Cole, rather than Community Grain or Farmland. The trial court's denying the

lien for the $12,577.96 expense was in error. The workers' compensation reimbursement must be increased by that amount.

Reversed and remanded.

COOK, J., concurs.

JUSTICE GREEN, specially concurring:
I agree with the majority that, as a matter of law, Community Grain and Farmland were entitled to a lien in the sum of $12,577.96 for expenses incurred in providing the PRM services. Accordingly, I concur in the decision to reverse and remand to have the reimbursement award increased by that sum.

Nevertheless, I am concerned because plaintiffs are being required to pay this sum to Community Grain and Farmland even though plaintiffs were not permitted to recover for this item in the case in chief. No case concerning the problem thus created has been called to our attention. However, in *Continental Casualty Co. v. Sweda* (1969), 113 Ill. App. 2d 423, 251 N.E.2d 65, the court held that when the recovery by an employee from a third party is less than the amount of compensation paid the employee, the employer seeking reimbursement under what is now section 5(b) of the Illinois Workers' Compensation Act (820 ILCS 305/5(b) (West 1992)) was entitled to the full recovery made by the employee and no equitable apportionment was to be made.

Presumably, here, the plaintiffs could have cross-appealed from the judgment rendered to them contending that the circuit court erred in excluding evidence concerning the cost of the PRM services. In doing so they would be placing in jeopardy their award of $1,752,037 because the only relief they could have received would have been a new trial as to damages which might have resulted in a lower damage award.

Because of the priority given in *Sweda* to reimbursement of the payor of the workers' compensation, I concur in the result reached by the majority, but I do so with concern for a problem that needs legislative study.